# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOSHUA L. REINHARD,

     Plaintiff,

        v.

DEPARTMENT OF HOMELAND
SECURITY,

     Defendant.

Civil Action No. 18-1449 (JEB)

## MEMORANDUM OPINION

The United States Coast Guard fired Plaintiff Joshua Reinhard following a barrage of misconduct allegations. Reinhard wishes to reverse this course. Believing that he was not given a fair shake, he has spent the last three years fighting the Coast Guard's administrative separation. In the present litigation, which is but a cog in the wheel of this broader dispute, Plaintiff has turned to a tool often employed by those vexed by government action: the Freedom of Information Act. Reinhard filed two requests with Defendant Department of Homeland Security — the federal agency that houses the Coast Guard — seeking records concerning his termination. These documents, he hopes, will reveal material beneficial to his appeal. In response, DHS turned over more than one thousand pages of records. In addition to this trove, however, it withheld some documents under FOIA's exemption for information shielded by litigation privileges. Plaintiff challenges those withholdings in this suit.

Both parties have now filed Motions for Summary Judgment. Concluding that the Government has met its burden as to many, but not all, of its withholdings, the Court will grant

in part in and deny in part both DHS's Motion for Summary Judgment and Reinhard's Cross-Motion.

## I.  Background

The factual path that led to Reinhard's FOIA requests bears little on the legal issue at hand.  The Court will thus skip this setup and proceed to details of his requests.  Readers curious to learn the circumstances behind his suit are directed to the opinion, issued by another court in this district, rebuffing Plaintiff's attempt to enjoin his separation from the military.  See Reinhard v. Johnson, 209 F. Supp. 3d 207, 210–13 (D.D.C. 2016).

Reinhard's first FOIA request went straight to the point.  He sought from DHS the release of "all communication and correspondence . . . amongst the command regarding his administrative separation."  See ECF No. 2 (Compl.), ¶ 6.  A few months later, Plaintiff followed up with a more targeted inquiry, this time seeking "the command climate survey conducted in or about January 2016 at Eighth Coast Guard District, New Orleans, Louisiana and into the climate under Captain Rush."  Id., ¶ 13.  After DHS did not satisfactorily respond within the statutorily prescribed timeframe, Reinhard filed this suit.  Id., ¶¶ 9–10, 17–18.

The Coast Guard eventually located numerous records responsive to both requests. (Unless the difference holds some significance, the Court will use the terms Defendant, the Government, DHS, and the Coast Guard interchangeably in this Opinion.)  It turned over to Plaintiff a total of 197 documents containing 1,069 pages of material.  See ECF No. 8 (Def. MSJ), Attach. 4 (First Declaration of Jesse L. Houck), ¶ C.4.  Defendant, however, redacted in part several documents and withheld others in full largely pursuant to FOIA Exemption 5's protection for inter- or intra-agency records shielded by a litigation privilege.  Id., Exh. E (First Vaughn Index) at 1–6.  Others it withheld or redacted under Exemption 6's shield for private

personal information and 7(C)'s protection for private law-enforcement records.  Id. at 4; First

Houck Decl., ¶ C.4.  Reinhard does not challenge documents withheld under these latter two

exemptions, instead saving his fire for the Coast Guard's invocation of Exemption 5.  See ECF

No. 11 (Pl. MSJ & Opp.) at 4.  Following Plaintiff's Motion for Summary Judgment, the

Government released several more documents, obviating the Court's need to wade into those

waters.  See ECF No. 15 (Def. Opp. & Reply), Attach. 1 (Second Declaration of Jesse L. Houck),

¶ 5.

After the parties completed briefing in this case, this Court ordered — as it often does in

these circumstances — that DHS provide unredacted copies of the disputed records *in camera*.

See Minute Order of Mar. 5, 2019.  Having reviewed these records, the Court is primed to

resolve the parties' dispute.

## II.  Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  A genuine issue of material fact is one that would change the outcome of the litigation.

See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Only disputes over facts that

might affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment.").  In the event of conflicting evidence on a material issue, the Court is to

construe the conflicting evidence in the light most favorable to the non-moving party.  See

Sample v. Bureau of Prisons, 466 F.3d 1086, 1087 (D.C. Cir. 2006).

FOIA cases typically and appropriately are decided on motions for summary judgment,

and the agency bears the ultimate burden of proof.  See Defenders of Wildlife v. Border Patrol,

623 F. Supp. 2d 83, 87 (D.D.C. 2009); Bigwood v. U.S. Agency for Int'l Dev., 484 F. Supp. 2d

68, 73 (D.D.C. 2007); see also Dep't of Justice v. Tax Analysts, 492 U.S. 136, 142 n.3 (1989). And "[u]nlike the review of other agency action[,] . . . the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'" U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B). The Court may grant summary judgment based solely on information provided in an agency's affidavits or declarations when they describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981). Such affidavits or declarations are accorded "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting Ground Saucer Watch, Inc. v. CIA, 692 F.2d 770, 771 (D.C. Cir. 1981)).

## III. Analysis

Congress enacted FOIA "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." Dep't of the Air Force v. Rose, 425 U.S. 352, 361 (1976) (quotation marks and citation omitted). In doing so, FOIA helps "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989) (citation omitted). The statute provides that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . shall make the records promptly available to any person." 5 U.S.C.

§ 552(a)(3)(A).  Consistent with this statutory mandate, federal courts have jurisdiction to order the production of records that an agency improperly withholds.  See id. § 552(a)(4)(B); Reporters Comm., 489 U.S. at 754–55.

The Government need not, however, turn over requested information that falls into one of nine statutorily created exemptions from FOIA's broad directive.  See 5 U.S.C. § 552(b)(1)–(9).  These exemptions must be "narrowly construed."  Rose, 425 U.S. at 361.  That is so because courts must "[a]t all times . . . bear in mind that FOIA mandates a 'strong presumption in favor of disclosure.'"  Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting U.S. Dep't of State v. Ray, 502 U.S. 164, 173 (1991)).

A.  Exemption 5

Only one exemption is at issue here: Exemption 5.  This applies to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  Withholdings are restricted to "those documents, and only those documents, normally privileged in the civil discovery context."  NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975); see also United States v. Weber Aircraft Corp., 465 U.S. 792, 798–99 (1984).  In contrast to certain disclosures in that context, the needs of a particular plaintiff are irrelevant to a court's determination of whether a particular communication is exempt from disclosure under Exemption 5.  See Martin v. Office of Special Counsel, Merit Sys. Prot. Bd., 819 F.2d 1181, 1184 (D.C. Cir. 1987) (citing Sears, Roebuck & Co., 421 U.S. at 149 & n.16).

Exemption 5 encompasses three distinct components — namely, the deliberative-process privilege (sometimes referred to as "executive privilege"), the attorney-client privilege, and the attorney-work-product privilege.  See Am. Immigration Council v. U.S. Dep't of Homeland Sec.,

905 F. Supp. 2d 206, 216 (D.D.C. 2012). Narrowed over the course of briefing, the parties' dispute concerns only the first two privileges. See Second Houck Decl., ¶ 8. The Court will begin with the documents for which DHS invokes the deliberative-process privilege, before turning to those for which the attorney-client privilege is at issue. In this case, these categories of documents do not overlap.

1. *Deliberative-Process Privilege*

The deliberative-process privilege shields internal agency "advisory opinions, recommendations and deliberations" in order to "protect[] the decision making processes of government agencies." Sears, Roebuck & Co., 421 U.S. at 150 (citations omitted). To qualify under this privilege, a record must meet two requirements. First, it must be predecisional — *i.e.*, "generated before the adoption of an agency policy." Judicial Watch, Inc. v. U.S. Dep't of Def., 847 F.3d 735, 739 (D.C. Cir. 2017) (citation omitted). Second, a record must be deliberative, meaning that it "reflect[s] the give-and-take of the consultative process." Id. (citation omitted). "A document that does nothing more than explain an existing policy cannot be considered deliberative." Public Citizen, Inc. v. OMB, 598 F.3d 865, 876 (D.C. Cir. 2010).

This privilege, Defendant contends, protects several documents responsive to Plaintiff's FOIA request. Reinhard does not see things the same way. To tee up this issue, the Court will briefly describe the records disputed here and then turn to the two-step inquiry that this privilege demands. (The Court will follow the parties' lead and refer to the documents by the "USCG" number referenced in the Vaughn Index and stamped on the bottom-right corner of each *in camera* record.)

Two documents are preliminary investigative reports. The first centers around Reinhard's conduct. After hearing that Plaintiff may have filed a retaliatory complaint against

another servicemember, the Coast Guard convened a civil-rights investigation. See ECF No. 15 (Def. Reply), Attach. 1 (Declaration of Jesse L. Houck), Exh. A (Updated Vaughn Index) at 1. It tasked an administrative investigations officer with looking at the allegation. The document at issue — titled "Preliminary Investigative Report Retaliation / Anti-Harassment Hate Incident Complaint" and dated August 28, 2015 — reveals that officer's findings and recommendations. Id. (USCG 10–24). The Coast Guard attests that this preliminary report predates and does not reflect the Coast Guard's final action on the issue (presumably, Plaintiff's termination), which is documented in a separate memo. Id.

The second report documents a command-climate investigation dated April 25, 2016, and appears to be the record Plaintiff referenced in his second FOIA request. Id. at 5 (USCG 513–32, 540–97, 695, 743–75); see also First Vaughn Index at 5–6. Like the first incident, the Coast Guard asked an administrative officer — here, Captain Orin E. Rush — to investigate allegations that had percolated up from its members. See Updated Vaughn Index at 5. This time, the concerns centered around a poor climate at the Marine Safety Unit Morgan City, which is a unit of Sector New Orleans in the Coast Guard's Eighth District. Id. This report is the fruit of that investigation. Id. The Coast Guard attests, however, that it is not reflective of the final agency action on this score. Rather, it says that the Coast Guard documented its ultimate response to the allegations of a negative command climate in a separate agency memo. Id. Although this investigation appears somewhat tangential to Reinhard's actual termination, he seems to believe that it contains information relevant to his separation. See ECF No. 8, Attach 2. (Def. Statement of Facts) at 6 (noting that Plaintiff's requests seek information related to his discharge); ECF No. 16 (Pl. Reply) at 1–2 (accepting as true and incorporating Defendant's Statement of Facts). DHS

contends that, while it withheld substantial portions, it released "[a]ll reasonably segregable, non-exempt information" contained in this report. See Updated Vaughn Index at 5.

Next — and finally — are two email threads. The first is an email from one member of the Coast Guard to another, which forwards a separate email. Id. at 1 (USCG 79). The topic centers on allegations of improper behavior by Plaintiff — namely, that "Chief Reinhard has been gossiping outside of the unit & some of it was about official business." Id. The second email thread concerns Reinhard's administrative-separation proceedings, which were ongoing at the time. Id. at 3 (USCG 231, 323–24). This email's title is "Follow-up on Member with 3rd AI." Id.

### a. Predecisional

The Court has little trouble concluding that all withheld information qualifies as predecisional. Because this showing logically requires that the document at issue predate a decision or policy, an agency can satisfy its burden here if it can "pinpoint" such later "decision or policy to which the document contributed." Senate of the Commonwealth of P.R. v. U.S. Dep't of Justice, 823 F.2d 574, 585 (D.C. Cir. 1987) (citation omitted). This route, however, is not the only path up the mountain. Recognizing that not all deliberative discussions culminate in a "single, discrete decision," the D.C. Circuit has held that an agency also passes muster by "identifying the decisionmaking process" in which the record played a role. See Access Reports v. Dep't of Justice, 926 F.2d 1192, 1196 (D.C. Cir. 1991); see also Gold Anti–Trust Action Comm., Inc. v. Bd. of Governors of the Fed. Reserve Sys., 762 F. Supp. 2d 123, 135–136 (D.D.C. 2011) ("[E]ven if an internal discussion does not lead to the adoption of a specific government policy, its protection under Exemption 5 is not foreclosed as long as the document was generated as part of a definable decision-making process."). Considering how an agency

might respond to a media or congressional query, for example, can fall into this latter camp.  See

Cause of Action Inst. v. U.S. Dep't of Justice, 330 F. Supp. 3d 336, 352 (D.D.C. 2018).

Defendant has satisfied its burden here.  As it points out, both investigative reports at

issue — one concerning Plaintiff's alleged retaliation and the other probing the command

climate — concern and predate the Coast Guard's ultimate action.  See Updated Vaughn Index at

1 (retaliation report); id. at 5 (command climate report).  For both reports, Defendant attests that

the Coast Guard issued its final decisions regarding the underlying allegations in later and

separate memos, which are "not reflective" of the preliminary reports.  Id.  Although DHS has

not said directly whether either of these final agency actions was, in fact, Plaintiff's termination

— certainly the response to the command-climate investigation does not appear to be — it need

not be so explicit to satisfy its burden.  Defendant has identified the relevant decisionmaking

process at issue: the manner in which the Coast Guard determined to respond to the issues and

allegations that spurred the investigations.  Id. at 1, 5.  No more is required at this step.  See

Access Reports, 926 F.2d at 1196.

One of the two email chains, similarly, occurs in the context of determining "how to

respond to the report of a potential operations security . . . violation by Plaintiff."  Updated

Vaughn Index at 1 (USCG 79).  The Coast Guard attests that the exchange is antecedent to any

final decision regarding its response.  Id.  Along the same lines, the other email thread discusses

"whether the Coast Guard would administratively separate Plaintiff."  Id. at 3 (USCG 231, 323–

24).  It thus clearly predates Plaintiff's actual administrative separation.  Id.  DHS has met its

burden of demonstrating that each document relates to and precedes either an agency decision or

the culmination of a decisionmaking process.

Plaintiff presents little meaningful opposition here. His only — although repeated — retort is to fault DHS for not tethering each document to a specific final agency action. See Pl. MSJ & Opp. at 7, 8, 10; Pl. Reply at 5 ("Defendant does not clarify what the final agency action is."). This lands wide of the mark. As explained above, DHS has, in fact, identified a specific final agency action for many of the documents. And for those for which it has only identified a decisionmaking process to which the documents contributed, rather than a specific final action, Plaintiff's assertion runs headlong into the D.C. Circuit's repeated holding that such an explanation suffices. See Access Reports, 926 F.2d at 1196; see also Nat'l Sec. Archive v. CIA, 752 F.3d 460, 466 (D.C. Cir. 2014) (similar); Judicial Watch, Inc. v. U.S. Dep't of State, 241 F. Supp. 3d 174, 183 (D.D.C. 2017) ("For a document to be predecisional, the agency does not have to 'point to an agency final decision.'") (citation omitted). For the reasons already stated, Defendant has satisfied its burden here.

### b. Deliberative

Having cleared the first hurdle with little effort, Defendant must now demonstrate that the documents at issue are deliberative and thus "reflect[] the give-and-take of the consultative process." Judicial Watch, 847 F.3d at 739 (citation omitted). Given that the analysis diverges depending on the record type at issue, the Court will so separate its discussion.

### i. Investigative Reports

Start with the two investigatory reports. Both include the opinions and recommendations of an administrative officer to the Coast Guard's ultimate decisionmakers. As DHS attests, these reports are not the Coast Guard's final word on the matter. See Updated Vaughn Index at 1, 5. Rather, the final decisionmakers memorialized their findings in a separate memo, which has already been turned over to Plaintiff. Id.; see also Second Houck Decl., ¶ 8.a. In formulating

their views, however, these decisionmakers did rely on the investigative reports' findings and recommendations. See Updated Vaughn Index at 1, 5. The reports are thus "written as part of the process by which the supervisor came to [a] final decision" but themselves have no "operative effect." Abtew v. U.S. Dep't of Homeland Sec., 808 F.3d 895, 899 (D.C. Cir. 2015) (citation omitted). Documents of this type, particularly when they reflect "advisory opinions [and] recommendations" of someone in the organizational chain, represent the prototypical deliberative documents shielded by the privilege. Id. at 898; see also Sears, Roebuck & Co., 421 U.S. at 150 (stating similarly) (citation and internal quotation marks omitted).

On this ground, too, the Government thus prevails. But this is not the end of the road, as the general application of the privilege "does not protect documents in their entirety." Loving v. Dep't of Def., 550 F.3d 32, 38 (D.C. Cir. 2008). Rather, if an otherwise-deliberative record contains non-deliberative sections that are segregable from the rest of the document — purely factual information, for instance — that portion must be disclosed. Id.

Reinhard plants his flag firmly on this ground. Even if the two investigative reports are partially deliberative, he argues, he is entitled to any factual subparts. See Pl. MSJ & Opp. at 10–12; Pl. Reply at 3–4, 9. Not so fast, retorts DHS. The selection of factual material itself, it contends, "is revelatory of the deliberative process involved in creating the report." Updated Vaughn Index at 1, 5. This is because the administrative officer tasked with writing the report must "cull through a mass of available resources," and thus the factual findings "reflect the investigating officer's preliminary thoughts and ideas about what source information was relevant." Id.

Broadly speaking, the Coast Guard has the better argument.  Given the daylight between the parties' view of the law on this score, however, the Court thinks it helpful to spend a minute laying out the applicable legal framework.

While the deliberative-process privilege does not generally extend to mere factual recitations, see In re Sealed Case, 121 F.3d 729, 737 (D.C. Cir. 1997), "the D.C. Circuit has cautioned against overuse of the factual/deliberative distinction."  Goodrich Corp. v. U.S. EPA, 593 F. Supp. 2d 184, 189 (D.D.C. 2009) (citing Dudman Commc'ns Corp. v. U.S. Dep't of Air Force, 815 F.2d 1565, 1568 (D.C. Cir. 1987)).  The reason for such hesitation is intuitive: in certain circumstances, the selection of facts itself can reveal the decisionmaking process.  See, e.g., Mead Data Cent., Inc. v. U.S. Dep't of the Air Force, 566 F.2d 242, 256 (D.C. Cir. 1977); Montrose Chem. Corp. of Cal. v. Train, 491 F.2d 63, 68 (D.C. Cir. 1974).  And the deliberative-process privilege "protects not only communications which are themselves deliberative in nature, but all communications which, if revealed, would expose to public view the deliberative process of an agency."  Russell v. Dep't of the Air Force, 682 F.2d 1045, 1048 (D.C. Cir. 1982); see also Mapother v. Dep't of Justice, 3 F.3d 1533, 1539 (D.C. Cir. 1993) (stating that privilege "serves to protect the deliberative process itself, not merely documents containing deliberative material").

That said, "a report does not become a part of the deliberative process merely because it contains only those facts which the person making the report thinks material."  Playboy Enterprises, Inc. v. Dep't of Justice, 677 F.2d 931, 935 (D.C. Cir. 1982).  More is required, as not every factual report necessarily qualifies as deliberative.  See Hardy v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 243 F. Supp. 3d 155, 168 (D.D.C. 2017) (stating that not "every factual report" is "protected as part of the deliberative privilege") (internal quotation

marks omitted). The factual material must reflect the "exercise of discretion and judgment calls" or otherwise reveal something about the "agency's deliberative process." Ancient Coin Collectors Guild v. U.S. Dep't of State, 641 F.3d 504, 513 (D.C. Cir. 2011) (citation omitted). Similarly, to the degree "pre-decisional materials, even if 'factual' in form, reflect an agency's preliminary positions or ruminations about how to exercise discretion on some policy matter, they are protected under Exemption 5." Fortson v. Harvey, 407 F. Supp. 2d 13, 16 (D.D.C. 2005) (quoting Petroleum Info. Co. v. U.S. Dep't of the Interior, 976 F.2d 1429, 1435 (D.C. Cir. 1992)). The application of this standard is thus a "context-specific" inquiry, see Hardy, 243 F. Supp. 3d at 168 (internal quotation marks omitted), that requires looking at the "individual document and the role it plays in the administrative process." Id. (quoting Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 867 (D.C. Cir. 1980)).

Following that direction, the Court concludes that the Government has met its burden as to some, but not all, of the material contained in and appended to the reports. Reinhard first challenges any "Findings of Fact" sections in the two investigatory reports. See Pl. MSJ & Opp. at 10–12; Pl. Reply at 3–4, 9. He contends that the "selection of the facts themselves for purpose of a report that will form the final action is not part of the deliberative process." Pl. Reply at 9.

Quite the contrary. In this particular circumstance, the Court concludes, these findings are exactly the type of factual sections that fall within the privilege's scope. The administrative investigation officer compiled these facts as part of a recommendation to the Coast Guard's ultimate decisionmakers on personnel matters. For such issues, the factual groundwork is intimately connected with the Coast Guard's ultimate action. These factual findings, therefore, are "intended to facilitate or assist development of the agency's final position on the relevant issue[s]" and thus reflect a core part of the deliberative process. Nat'l Sec. Archive, 752 F.3d at

463; see also Elec. Privacy Info. Ctr. v. Transp. Sec. Admin., 928 F. Supp. 2d 156, 167–68

(D.D.C. 2013) (stating that privilege applies when "the factual material here was not assembled

for an agency actor merely to pass along to outsiders, but rather for purely internal deliberative

purposes"). To come up with these factual findings, the investigator had to "'extract[] pertinent

material' from a larger universe of facts." Hardy, 243 F. Supp. 3d at 170 (quoting Mapother, 3

F.3d at 1539); see also McKinley v. Bd. of Governors of Fed. Reserve Sys., 849 F. Supp. 2d 47,

63–64 (D.D.C. 2012) (holding that "cull[ing] selected facts . . . from the mass of available

information" to assist a "decision making process" fell under privilege). This process itself

reflects an "exercise of judgment as to what issues" should matter to the final decisionmakers.

See Ancient Coin Collectors Guild, 641 F.3d at 513–14 (citation omitted). These factual

findings are thus both revelatory of the Coast Guard's deliberative process and the investigator's

judgment. That does the trick. When final decisionmakers rely on others to condense a mass of

available information into a summary or set of factual findings that the staff thinks important to

the final decisionmaker, the deliberative-process privilege applies. See Leopold v. CIA, 89 F.

Supp. 3d 12, 23 (D.D.C. 2015).

One other aspect of these factual findings reinforces the conclusion. As noted earlier, the

privilege extends beyond "documents containing deliberative material" to include records whose

disclosure would reveal something about "the deliberative process itself." Mapother, 3 F.3d at

1537. In this case, the factual findings could very well reveal how the investigator went about

collecting information to craft a recommendation to the Coast Guard's final arbiters. As such, its

disclosure could shed light on the method by which the Coast Guard came to its conclusion

regarding the personnel matters at issue. The possibility that disclosure could reveal more about

"the deliberative process itself" fortifies the Court's determination that the documents fall within the privilege's scope.  Id.

That leaves the trove of witness statements, interview notes, and apparently related material appended to the command-climate report and contained at USCG 540–97, 695, and 743–775.  Documents such as these may be deserving of protection "where they contain the author's opinions, analysis, or impressions."  Nat'l Whistleblower Ctr. v. Dep't of Health & Human Servs., 849 F. Supp. 2d 13, 38 (D.D.C. 2012); see also Hardy, 243 F. Supp. 3d at 169 (stating that "interview notes and summaries" that "separat[e] the pertinent from the [not] pertinent" are "routinely found to be subject" to privilege) (citation omitted); Breiterman v. United States Capitol Police, 323 F.R.D. 36, 47 (D.D.C. 2017) (concluding that deliberative-process privilege "protects interview notes that summarize facts 'culled . . . from the much larger universe of facts presented to [the agency]'") (quoting Ancient Coin Collectors Guild, 641 F.3d at 513).  Like any other aspect of a FOIA exemption, Defendant bears the burden of demonstrating the application of the invoked privilege to the documents at issue.  See Nat'l Whistleblower Ctr, 849 F. Supp. 2d at 25 (citing Reporters Comm., 489 U.S. at 755).  Here, the Coast Guard falters.

In its original Vaughn Index, Defendant offered but brief and conclusory statements in support of its withholding of these records.  See First Vaughn Index at 5–6.  In his Opposition, Reinhard pointed out — correctly — that such statements are insufficient to carry the Government's burden.  See Pl. MSJ & Opp. at 10–12.  But not all was lost for DHS: it still had its Reply brief to correct its error.  And, indeed, it took this opportunity to submit a second declaration from Jesse Houck, which included a beefed-up Vaughn Index.  See Updated Vaughn Index at 1–6.  For numerous documents, including many of the ones addressed above, this

updated Index added sufficient detail to clear the necessary hurdle.  The witness statements and interview notes, however, tell a different story.  Instead of adding more detail, the Coast Guard lumped this mass of documents into its entry for the command-climate investigative report, removing altogether its rationale specific to these statements.  See Updated Vaughn Index at 5.

This move is a bit perplexing.  In the report itself, the investigating officer distilled a mass of information into the salient details and provided his opinions on the events underlying the report, which culminated in his recommendation to the Coast Guard's final decisionmakers.  It is on this basis — i.e., the investigating officer's deliberative judgment in distilling facts and promulgating advisory opinions — that both the Government asked that the report be protected and upon which the Court has granted that request.  Id. (stating that "materials . . . reflect the investigating officer's preliminary thoughts and ideas" and thus decision to include or exclude facts is deliberative and cannot be segregated) (emphasis added).  That rationale, however, does not extend — at least not with the same force — to the witness statements, interview notes, and related material.  The Government does not even acknowledge the existence of, much less address directly, these documents in its Reply.  See ECF No. 15 (Def. Opp. & Reply).  (The brief, the Court also notes, clocks in at just four pages, only one and a half of which is dedicated to the deliberative-process privilege.)

Nor does the Court's in camera review reveal the application of the privilege to be self-evident.  As far as it can tell, most of the interview notes reflect a comprehensive rehearsal of what the interviewee recounted.  On their face, nothing about most of these statements shows the notetaker to be "separating the pertinent from the [not] pertinent."  Hardy, 243 F. Supp. 3d at 169 (quoting Montrose Chemical Corp., 491 F.2d at 68).  Such notes generally fall outside the privilege's scope.  See Nat'l Whistleblower Ctr., 849 F. Supp. 2d at 38 (concluding that notes

that "merely record or summarize factual content from the meetings, calls, or interviews . . . must be disclosed"); see also id. (stating that privilege not generally applicable to agency employee's notes, "even though such notes inherently reveal what the notetaker thought was noteworthy about the subject of the notes"); Waters v. U.S. Capitol Police Bd., 216 F.R.D. 153, 162 (D.D.C. 2003) (concluding that "application of this privilege to the investigators' notes . . . is a poor fit"). Certainly the witness statements, which appear to have been written by the witnesses themselves, do not reflect the "personal opinions . . . of the investigating officer," contrary to what the Coast Guard's sole statement on this count attests. See First Vaughn Index at 5; accord Updated Vaughn Index at 5.

To be clear, the Court does not rule out the possibility that information like this could be deliberative or otherwise protected by another FOIA exemption. The point here is that the Government has not made an argument appropriately tailored to these statements to permit the Court to reach that determination.

Similarly, it is possible that a subset of the interview notes does, in fact, reveal something about the investigating officer's views and judgment — e.g., by divulging the questions asked — sufficient to qualify as deliberative even if the bulk does not. Again, however, it is DHS's burden to separate the wheat from the chaff. The Court will not do Defendant's job. Should it wish to protect records in a FOIA suit, DHS must put in the work of justifying the privileges claimed. Its silence on this count is fatal. Documents stamped USCG 540–97, 695, and 743–75 must thus see the light of day.

ii. Email Chains

With that lengthy discussion of the deliberative nature of the investigative reports complete, the Court can now turn to the two email chains at issue. It has little trouble concluding

that these documents reflect deliberation.  As a reminder, both are internal Coast Guard threads discussing allegations of improper behavior by Plaintiff.  See Updated Vaughn Index at 1 (USCG 79), 3 (USCG 231, 323–24).  One discusses a potential operations-security violation, the other his administrative-separation proceedings.  To the degree that Reinhard worries that the documents are not sufficiently deliberative to warrant protection, he can rest easy.  Having seen the documents *in camera*, the Court can confirm what the Coast Guard attests in its Vaughn Index: the documents contain discussion and preliminary assessments about how to respond to the relevant personnel matters.  See Updated Vaughn Index at 1, 3.  They reflect the authors' views on how to proceed, thus falling squarely within the scope of the privilege.  See Abtew, 808 F.3d at 898; Sears, Roebuck & Co., 421 U.S. at 150.

Reinhard's specific challenges to this general conclusion have narrowed over time.  After his initial brief, the Coast Guard updated its Vaughn Index, providing much of the information Plaintiff faulted Defendant for not previously supplying.  See Updated Vaughn Index at 1, 3; Pl. MSJ & Opp. at 7–10.  By the time his Reply brief rolled around, Reinhard seems to retain one challenge unique to the first email.  As to the second email, his challenge is a variant of another he repeatedly levels at the Coast Guard: that any predecisional information that does not differ from the final agency action loses its protection and must be released.  See Pl. Reply at 7–8.  The Court addresses this attack separately below.  See *infra*, Section III.A.1.c.

It begins with the first email thread, which discusses Reinhard's potential operations-security violation.  See Updated Vaughn Index at 1 (USCG 79).  Plaintiff faults the Department for insufficiently specifying the role each individual played in the deliberative process.  See Pl. Reply at 5.  It is true that, in general, "the agency must describe 'the nature of the decisionmaking authority vested in the office or person issuing the disputed document(s), and the

positions in the chain of command of the parties to the documents.'" <u>Elec. Frontier Found. v. U.S. Dep't of Justice</u>, 826 F. Supp. 2d 157, 168 (D.D.C. 2011) (quoting <u>Arthur Andersen & Co. v. IRS</u>, 679 F.2d 254, 258 (D.C. Cir. 1982)). Without such information, the Court may not be able to determine "the particular decisionmaking processes to which the withheld documents contributed, and the role the withheld documents played in those processes." <u>Id.</u>; <u>see also Animal Legal Defense Fund, Inc. v. Dep't of Air Force</u>, 44 F. Supp. 2d 295, 299 (D.D.C. 1999) (requiring agency to identify "what deliberative process is involved, and the role played by the documents in issue in the course of that process") (quoting <u>Senate of the Commonwealth of P.R.</u>, 823 F.2d at 585–86) (emphasis omitted). All in all, the point of this exercise is to provide sufficient contextual clues to allow the Court to determine whether the withheld document does, in fact, qualify as deliberative. <u>See</u> <u>Elec. Frontier Found.</u>, 826 F. Supp. 2d at 168.

Here, however, the Coast Guard has done all it needs to. The <u>Vaughn</u> entry notes that the document contains an email from an individual — whose name is redacted, but who is "Plaintiff's direct supervisor" — to Commander Miller, who then forwards the email to Commander Gilmore. <u>See</u> Updated <u>Vaughn</u> Index at 1. Plaintiff's supervisor's place in the organizational chain is subordinate to Commander Miller, who is in turn subordinate to Commander Gilmore. <u>Id.</u> In this thread, the Coast Guard thus feeds the issue up the chain of command. This is precisely the type of information that permits a court to conclude that a document qualifies as deliberative. <u>See</u> <u>Access Reports</u>, 926 F.2d at 1195 (noting that "document from a junior to a senior is more likely to reflect his or her on subjective opinions and will clearly have no binding effect on the recipient").

Along similar lines, the Coast Guard has already both explained the decisionmaking process at issue — namely, determining how to respond to Reinhard's potential operations-

security violation — and the authority vested in the documents' authors. See Updated Vaughn Index at 1. It has also explained the role of this document: it reflects "preliminary assessments" by Plaintiff's "supervisors" regarding their recommendations on this issue. Id. Defendant has thus supplied enough information about the "authority vested" in the individuals and "the role played by the documents" in the process at issue to determine that the withheld record passes the second step of this privilege's inquiry. See Hardy, 243 F. Supp. 3d at 168 (citations omitted).

To the degree Reinhard wants more, the law does not so require. The Coast Guard has "provide[d] the minimal information necessary to make a determination concerning applicability of the deliberative process privilege." Heffernan v. Azar, 317 F. Supp. 3d 94, 118–19 (D.D.C. 2018) (internal quotation marks omitted); see also Cent. for Biological Diversity v. U.S. EPA, 279 F. Supp. 3d 121, 147 (D.D.C. 2018). As such, this email may remain withheld.

### c.   Adoption

Plaintiff has one more arrow in his quiver. Even if a document is antecedent to a final agency decision, he next argues, DHS has not sufficiently demonstrated that the recommendations expressed in the documents differ from the Coast Guard's final action. See Pl. Reply at 4–9. What Plaintiff appears to be referencing is the rule that a predecisional document "can lose that status if it is adopted formally or informally, as the agency position on an issue[.]" U.S. Dep't of the Treasury v. Pension Benefit Guar. Corp., 222 F. Supp. 3d 38, 42 (D.D.C. 2016) (quoting Coastal States, 617 F.2d at 866).

Reinhard's argument holds no water. His brief appears to rest on the belief that any aspect of a deliberative document that reflects the course the Agency ultimately decides to chart cannot be deliberative. That is not so. To be sure, if the Coast Guard had adopted, say, an investigative report as its final report on the issue, then it may lose its protection. See Elec.

Frontier Found. v. U.S. Dep't of Justice, 739 F.3d 1, 7 (D.C. Cir. 2014) (holding that the privilege does not extend to "opinions and interpretations which embody [an] agency's effective . . . policy") (quoting Sears, Roebuck & Co., 421 U.S. at 153). But that did not happen here. A recommendation memo laying out the bases for a possible decision and emails discussing how to respond to a situation do not lose their status as deliberative simply because the decisionmaker followed the recommendation. While the privilege does not protect a document that "reflects the policy itself," it does shield records that "reflect[ ]the ideas, theories, or suggestions that go into the making of policy." Canning v. U.S. Dep't of State, 346 F. Supp. 3d 1, 28 (D.D.C. 2018) (citations omitted). Said otherwise, the privilege continues to protect "'all papers which reflect the agency's group thinking in the process of working out its policy,' . . . even if portions of that 'thinking' are ultimately persuasive to those charged with making final, operative decisions." Id. (quoting Elec. Frontier Found., 739 F.3d at 7). "Moreover, the agency does not carry the burden of proving that each withheld document was not adopted formally or informally." Heffernan, 317 F. Supp. 3d at 122 (citation omitted).

By asking that any document consistent with the Coast Guard's eventual decision be released, Reinhard asks for too much. The two investigative reports are not the Coast Guard's "policy itself" on the relevant issue. Canning, 346 F. Supp. 3d at 28. Those decisions were promulgated in separate memos, which, when responsive to his FOIA requests, were already turned over to Plaintiff. See Second Houck Decl., ¶¶ 8(a), 8(f). Similarly, there can be little doubt that the recommendations set out in the emails merely reflect the "ideas, theories, [and] suggestions" that go into that decision, rather than the "policy itself." Canning, 346 F. Supp. 3d at 28.

Two of Reinhard's challenges to specific documents warrant brief mention. First, he points out that the final agency memo ruling on Plaintiff's retaliatory civil-rights complaint explicitly notes that the author "reviewed" the facts found in the investigative report and includes that document as an enclosure. See Pl. Reply at 4. From this, he erroneously concludes that the investigative report reflects the Coast Guard's final action. Id. As stated above, the fact that a final decisionmaker reviewed, or even relied on, a predecisional recommendation does not render that whole recommendation "the policy itself." Canning, 346 F. Supp. 3d at 28. It is the final agency memo that, in this case, reflects the policy. That the Coast Guard chose to attach an initial recommendation to this final memo does not alter that conclusion.

Plaintiff's second document-specific attack concerns the email chain, authored by members of the Coast Guard Personnel Services Command, that discusses the administrative-separation proceedings then ongoing against Reinhard. This body is tasked, the Coast Guard says, with "mak[ing] its own independent determination as to whether . . . the Coast Guard would administratively separate Plaintiff." Updated Vaughn Index at 3. It is with this last description that Reinhard takes issue. Under his read of the governing regulations, the Personnel Services Command may only "approve or disapprove" of a finding of the Administrative Separation Board and may not rely on "extraneous information." Pl. Reply at 7. If this email includes extraneous information, Plaintiff says, it constitutes a violation of the Coast Guard's own procedural policy. Id.

This squabble, however, ultimately bears little on the claims asserted here. If Reinhard intends to invoke the government-misconduct exception to the deliberative-process privilege, see, e.g., Nat'l Whistleblower Ctr. v. Dep't of Health & Human Servs., 903 F. Supp. 2d 59, 67 (D.D.C. 2012), he never says so explicitly. Nor does he explain how any potential impropriety

rises to the level of "extreme government wrongdoing" necessary to override this privilege. See Wisdom v. U.S. Trustee Program, 266 F. Supp. 3d 93, 106 (D.D.C. 2017) (citation omitted). Plaintiff's omission is a problem here, since it is his obligation to "provide an adequate basis for believing" that the exception applies. See Judicial Watch, Inc. v. U.S. Dep't of State, 235 F. Supp. 3d 310, 314 (D.D.C. 2017) (citation omitted). This burden is not satisfied easily; it requires "meet[ing] a high bar." Bernegger v. Exec. Office of U.S. Attorneys, 334 F. Supp. 3d 74, 92 (D.D.C. 2018) (citation omitted). But all his brief contains on this count is a brief argument in the alternative speculating that if the email contains certain information then there exists a "concern" that the Coast Guard has run afoul of its own internal procedures. See Pl. Reply at 7. This simply does not do the trick. And absent the application of this exception, the Court sees no legal hook into the propriety of the Coast Guard's withholding. As the Government has demonstrated the application of the deliberative-process privilege and Reinhard has put forth insufficient information to justify overriding this protection, Defendant must prevail on this score.

### 2. *Attorney-Client Privilege*

Next up is the attorney-client privilege. The Coast Guard invokes this privilege as to a host of communications withheld from Plaintiff, none of which overlaps with those for which it invoked the deliberative-process privilege. See Updated Vaughn Index at 1–6; Second Houck Decl, ¶ 8. The Court, consequently, must take an independent look at this justification.

The attorney-client privilege shields from disclosure "confidential communications from clients to their attorneys," as well as "communications from attorneys to their clients" containing confidential information supplied by the client. See Tax Analysts v. IRS, 117 F.3d 607, 618 (D.C. Cir. 1997). As with the other prongs of Exemption 5, the burden rests with the

Government to prove, through "detailed and specific information," that the withheld information

falls within the domain of the privilege. See Campbell v. U.S. Dep't of Justice, 164 F.3d 20, 30

(D.C. Cir. 1998). In order to prevail on a motion for summary judgment in this area, the

Government must substantiate five essential elements in its supporting documentation:

> (1) [T]he holder of the privilege is, or sought to be, a client; (2) the
> person to whom the communication is made is a member of the bar
> or his subordinate and, in connection with the communication at
> issue, is acting in his or her capacity as a lawyer; (3) the
> communication relates to a fact of which the attorney was informed
> by his client, outside the presence of strangers, for the purpose of
> securing legal advice; and (4) the privilege has been claimed by the
> client. Additionally, [(5)] a "fundamental prerequisite to the
> assertion of the privilege" is "confidentiality both at the time of the
> communication and maintained since."

Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec., 841 F. Supp. 2d 142, 153–54 (D.D.C.

2012) (citing In re Sealed Case, 737 F.2d 94, 98–99 (D.C. Cir. 1984); Coastal States, 617 F.2d at

863); accord FTC v. GlaxoSmithKline, 294 F.3d 141, 146 (D.C. Cir. 2002).

"In the governmental context, the 'client' may be the agency and the attorney may be an

agency lawyer." Tax Analysts, 117 F.3d at 618. In such a situation, the privilege "functions to

protect communications between government attorneys and client agencies or departments." In

re Lindsey, 158 F.3d 1263, 1269 (D.C. Cir. 1998). Where an agency lawyer serves in a mixed

capacity that involves responsibilities both within and "outside the lawyer's sphere," however,

the agency employee's communications will be protected only to the extent that they involve her

professional, legal capacity. In re Sealed Case, 737 F.2d at 99.

At issue here are myriad emails related to Reinhard's separation. See Updated Vaughn

Index at 1–5 (covering USCG 80, 81, 217, 237, 240, 241–42, 243, 249, 252, 326–27, 410–11,

and 413). At first blush, these documents appear to fall under the privilege's umbrella. As the

Coast Guard pointed out in its Vaughn Index, every withheld record reveals a communication

between a member of a Coast Guard unit and a Coast Guard attorney.  Id.  In these cases, the Coast Guard unit — MSU Morgan City for most, and Coast Guard Sector New Orleans for the remainder — serves as the client, and the Coast Guard attorney serves as that unit's lawyer.  See Updated Vaughn Index at 1–5; see also In re Lindsey, 158 F.3d at 1269; Tax Analysts, 117 F.3d at 618.  For each record, Defendant lists the subject matter of the communication.  It then attests that, for each relevant email, the client — i.e., a member of the Coast Guard unit — either seeks legal advice from the attorney on that subject, or the attorney offers legal advice on it.  See Updated Vaughn Index at 1–5.  Finally, the Coast Guard affirms that each email is "confidential" and has been "circulated no further than among those members of the Coast Guard authorized to speak or act for the Coast Guard in relation to the subject matter of this email."  Id.  These affirmations, not surprisingly, closely track the requirements of the attorney-client privilege.

Against the backdrop of this straightforward analysis, Plaintiff mounts two categories of challenges.  He first contends that the Coast Guard has not sufficiently demonstrated that the emails serve a legal purpose.  Second, Reinhard contests Defendant's assertion of confidentiality. The Court will address each in turn.

a.  Purpose

Reinhard first takes issue with the purpose of the communication.  This challenge comes in two forms.  First, there is "no indication," he repeatedly maintains, that the withheld documents were "made for the purpose of the 'client' seeking an opinion on law, legal services, or assistance in some legal proceeding."  Pl. MSJ & Opp. at 14; id. at 16–26; Pl. Reply at 11–25 (repeating this challenge for every withheld document).  An email from one person to another, "who happens to be an attorney," he explains, is not automatically protected.  See Pl. Reply at 11.

At the outset, the Court notes that Plaintiff's factual characterization appears off base.  In every relevant entry of the Vaughn Index (with one exception; more on this in a minute), the Coast Guard explains that each email is sent directly from a Coast Guard attorney to a member of a Coast Guard unit, who serves as the client in this context, or vice versa, and names those individuals.  See Updated Vaughn Index at 1–5; see also Hunton & Williams LLP v. EPA, 248 F. Supp. 3d 220, 255 (D.D.C. 2017) (requiring "document-specific information such as the identities of the client and lawyer and whether legal advice was sought").  It then explicitly affirms that the sender either "offers" or "solicits legal advice" on a specified subject.  See Updated Vaughn Index at 1–5.  Absent a showing of bad faith — of which there is not even a hint here — such statements are trusted by the courts.  See SafeCard Servs., Inc., 926 F.2d at 1200; Military Audit Project, 656 F.2d at 738.  Contrary to Reinhard's position, therefore, this agency affirmation offers a significant "indication" that the purpose of the communications at issue centers on legal advice.  See Pl. Reply at 11.

Even if the Vaughn Index left any doubt about the purpose of the communications, the Court's in camera review confirms that the lion's share of the withheld exchanges qualifies for protection.  In addition to confidential communications from a client to an attorney, the privilege shields "communications from attorneys to their clients if the communications rest on confidential information obtained from the client." Tax Analysts, 117 F.3d at 618 (citations omitted).  The relevant communications from an attorney to a member of the Coast Guard all involve, often explicitly, material provided by the Coast Guard to the attorney for the purpose of the legal issue mentioned in the Vaughn Index.  That is sufficient to satisfy this element of the privilege.  Plaintiff need not fear that these emails merely involve someone "who happens to be

an attorney" and are untethered to legal advice.  See Pl. Reply at 11.  Having seen the emails *in camera*, the Court can confirm that the communications are a product of a legal relationship.

There is one exception to this conclusion, as hinted above.  In the <u>Vaughn</u> Index relating to document numbers USCG 410 and 411 — which are two copies of an identical document — the Coast Guard notes that the email is sent from one Coast Guard commissioned officer to another, neither of whom is a lawyer.  See Updated <u>Vaughn</u> Index at 5.  The sender, however, does copy two Coast Guard attorneys on the communication.  Although the fact that the attorneys are listed on the carbon-copy line rather than as a top-line recipient is far from dispositive, it does raise a red flag regarding the core objective of the email.

To sustain the privilege, the Agency need not show that the provision of legal advice was the communication's sole purpose; it does, however, need to demonstrate that securing legal advice was a "primary purpose" of the agency's communication.  See <u>In re Kellogg Brown & Root, Inc.</u>, 756 F.3d 754, 759-60 (D.C. Cir. 2014).  The fact that the attorneys are not the direct recipients thus gives the Court some doubt about its legal purpose.  See <u>Hunton & Williams LLP</u>, 248 F. Supp. 3d at 254 (concluding that "brief description does not sufficiently explain the application of the attorney-client privilege, given that the context makes it clear that the attorney was only a participant in the email chain as a carbon-copy").  More is thus needed to sustain the privilege.  <u>Id.</u>  Nor, having seen the document *in camera*, is the author's advice-seeking objective self-evident.  Although Defendant could theoretically dispel this doubt, it has provided no such explanation here.  As a result, the Government has not met its burden as to these documents.

Reinhard's second challenge is a variant of his first.  He takes issue with the fact that the attorneys' names and, in some cases, specific position(s) are unavailable to him.  See Pl. Reply at 11–25 (repeating this concern).  The import of this observation appears to be that, if he does not

know who sent the email, he cannot be confident whether the communication was indeed made for the purpose of legal advice.  See Pl. Reply at 11.  Some attorneys in the Coast Guard, he contends, are not in the business of providing legal advice to other members of the Coast Guard. Id.

For the sake of clarity, the Court notes that the Vaughn Index does include each attorney's full name and information about his or her position.  The Coast Guard, however, has redacted a few of these individuals under Exemption 6's protection for certain personal information to protect their privacy.  See 5 U.S.C. § 552(b)(6); Second Houck Decl., ¶ 5.  These individuals, it says, are "junior Coast Guard personnel."  Second Houck Decl., ¶ 5.  Reinhard does not challenge these redactions as improper under Exemption 6.  His concern, it seems, is whether the withheld documents fall under the attorney-client privilege.  The Court can allay this fear.  Having seen both the names and positions of the relevant attorneys in the unredacted Vaughn Index and the emails at issue — as well as having reviewed the substance of those emails — it is clear that the documents relate to a legal purpose in a manner that qualifies for the privilege's protection.

Along similar lines, to the degree Plaintiff wishes for more specificity in these attorneys' titles, his request finds no home.  The Court does not think, nor does Reinhard cite any case law for the proposition, that an individual's specific title is necessarily required in a Vaughn Index. Here, an affirmation that the individual is an attorney for an organization that provides legal advice to the relevant agency and an avowal that the purpose of this specific communication was legal in nature does the trick.

### b. Confidentiality

Closing in on the end, Plaintiff mounts one final attack.  Even if the documents could otherwise qualify for the privilege, he contends, the inclusion of several individuals — who are not members of the Bar — on the email chains vitiates this protection.  See Pl. MSJ & Opp. at 17–19, 22–26; Pl. Reply at 11–25 (repeating this assertion as to each document).

Reinhard is off to a promising start.  Confidentiality is indeed a "fundamental prerequisite" of the attorney-client privilege.  See Coastal States, 617 F.2d at 863.  That confidentiality must both exist "at the time of the communication and [be] maintained since."  Id.  As such, the "voluntary disclosure by the client to a third party breaches the confidentiality of the attorney-client relationship and therefore waives the privilege."  In re Sealed Case, 676 F.2d 793, 809 (D.C. Cir. 1982).  The test in this circumstance is whether the information was "circulated no further than among those members 'of the organization who are authorized to speak or act for the organization in relation to the subject matter of the communication.'"  Coastal States, 617 F.2d at 863 (quoting Mead Data, 566 F.2d at 253 n.24); see also GlaxoSmithKline, 294 F.3d at 147–48 (stating similarly).

The Coast Guard, for its part, affirms that the confidentiality requirement has been satisfied: "The contents of this email," the Vaughn Index avows for each relevant document, "were circulated no further than among those members of the Coast Guard authorized to speak or act for the Coast Guard in relation to the subject matter of this email."  Updated Vaughn Index at 1–5.  Reinhard wants more.  He asks for affirmation that the emails were not forwarded and, for each individual to whom an email was sent or copied, his or her name, billet, and "relationship to the subject matter."  Pl. Reply at 11–12.  To satisfy its burden, Plaintiff also believes that the

Government must explain whether it "has a specific policy in place that ensures emails pertaining to such matters are kept confidential." Id. at 12.

The Court agrees that the Government should provide some form of this information, although it need not comply with the specificity Reinhard seeks. In order to meet its burden of showing confidentiality, Defendant must supply a reasonable foundation to establish that the individuals who received the email fall within the scope of the privilege. See Coastal States, 617 F.2d at 863 (holding that privilege vitiated when information circulated beyond "those members of the organization who are authorized to speak or act for the organization") (internal quotation marks omitted); In re Veiga, 746 F. Supp. 2d 27, 34 (D.D.C. 2010) (stating that "conclusory statements" and "generalized assertions" insufficient). In the presence of an unexplained individual, DHS's common refrain that the email was not "circulated" beyond those "authorized to speak or act" on the matter is too conclusory to get it over the line. See Updated Vaughn Index at 1–5. In this context, the Government must identify the individuals to whom the email was sent (directly or via forwarding) and, at a minimum, aver that the subject matter relates to their official duties. See Shurtleff v. U.S. EPA, 991 F. Supp. 2d 1, 17 (D.D.C. 2013) (requiring this detail); cf. GlaxoSmithKline, 294 F.3d at 147–48 (stating that court can "reasonably infer" that "information was deemed necessary for the employees' . . . work" when, among other things, "the contents of the documents are related generally to the employees' . . . duties").

DHS has, however, satisfied this standard for the most part. As already noted in a previous discussion, the unredacted Vaughn Index identifies by name every person who sent, received, or was copied on each email, with a few notable exceptions discussed below. See Updated Vaughn Index at 1–5. It also details each individual's general role within the organization, either in the specific Vaughn entry or elsewhere in the Index. Id. The Court is

satisfied with these descriptions, from which it can draw a reasonable inference that the non-attorney individuals fall within the realm of those protected by the privilege. Their inclusion on the emails thus does not vitiate the information's protection. This conclusion applies to documents for which the non-attorney received the protected email by both forwarding and copying.

As noted, however, there are exceptions to this analysis. Both USCG 80 and 81 copy a Michael C. McKean, whose position and role is not otherwise explained in the Index, supporting declaration, or briefs. The same is true — although the mystery individual and placement on the address line differ — for USCG 243. As such, the Court is unable to discern whether or not the email's information was shared beyond those "authorized to speak or act" or otherwise qualified under a "need to know" basis. See GlaxoSmithKline, 294 F.3d at 147 (citation omitted). The Coast Guard's repeated refrain that the emails were "circulated no further" than among those "authorized to speak or act" is insufficient when the record demonstrates that the email was sent to an unexplained individual. These documents, therefore, must be disclosed, at least upon the current record.

As to Reinhard's last requests — that the Government explain its email-confidentiality policy — the Court searches in vain for any authority in support. And although he cites one case in which the Government satisfied its burden after providing similar information, see Cuban v. SEC, 795 F. Supp. 2d 43, 57 (D.D.C. 2011), he, too, does not appear to have found a decision stating that such detailed and specific showings are necessary. On this count, as there is no evidence to the contrary, the Court will accept the Government's general (although repeated) avowal that the documents were not later circulated beyond Coast Guard members who qualify under the privilege. See also, e.g., Nat'l Sec. Counselors v. CIA, 206 F. Supp. 3d 241, 286–87

(D.D.C. 2016) (stating that "plaintiff provides no basis upon which to conclude that these materials were shared with agency employees who were not responsible for carrying out the record processing tasks described therein"); Cuban v. SEC, 744 F. Supp. 2d 60, 79–80 (D.D.C. 2010) (requiring only that agency address "whether those communications were circulated no further than among those members of the organization who are authorized to speak or act for the organization in relation to the subject matter of the communication") (internal quotation marks omitted). To the degree Reinhard thinks a separate avowal is necessary that the emails were not forwarded, see Pl. Reply at 11, beyond the one given above, the Court disagrees. Absent contrary evidence in the record, the Coast Guard's statements get it over the line. On this score, Plaintiff's demand for more is "overreaching." GlaxoSmithKline, 294 F.3d at 147–48.

*       *       *

With that discussion complete, here is how things shake out. The Government has met its burden of justifying the applicability of the deliberative-process privilege as to all documents for which it invoked this privilege, except USCG 540–97, 695, and 743–75. These must be released. The same is true of the attorney-client privilege: the Government has met its burden except for USCG 80, 81, and 243, which must be turned over.

B. Segregability

Finally, FOIA requires that any "reasonably segregable portion of a record shall be provided to any person requesting such record after the deletion of the portions which are exempt." 5 U.S.C. § 552(b). While the Government is "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material," Hodge v. FBI, 703 F.3d 575, 582 (D.C. Cir. 2013) (quoting Sussman v. U.S. Marshals Service, 494 F.3d 1106, 1117 (D.C. Cir. 2007)), this presumption of compliance does not obviate its obligation to carry its

evidentiary burden and fully explain its decisions on segregability. See Mead Data, 566 F.2d at 261-62. To do so, the agency must provide "a 'detailed justification' and not just 'conclusory statements' to demonstrate that all reasonably segregable information has been released." Valfells v. CIA, 717 F. Supp. 2d 110, 120 (D.D.C. 2010) (citing Mead Data, 566 F.2d at 261); see also Armstrong v. Exec. Office of the President, 97 F.3d 575, 578–79 (D.C. Cir. 1996) (determining government affidavits explained nonsegregability of documents with "reasonable specificity"). "Reasonable specificity" can be established through a "combination of the Vaughn index and [agency] affidavits." Johnson v. Exec. Office for U.S. Attorneys, 310 F.3d 771, 776 (D.C. Cir. 2002).

Defendant has met that burden here as to the documents to which a privilege applies. Both the Coast Guard's Vaughn Index and accompanying affidavits explain that all segregable information has been turned over to Plaintiff. See Updated Vaughn Index at 1–5; Second Houck Decl., ¶ 6; First Houck Decl., ¶ C.8. Having seen the documents *in camera*, the Court can confirm that any snippets of information that fall outside of the privilege would not retain any meaning or "informational value." Neufeld v. IRS, 646 F.2d 661, 666 (D.C. Cir. 1981), overruled on other grounds, Church of Scientology of Calif. v. IRS, 792 F.2d 153 (D.C. Cir. 1986); see also Mead Data, 566 F.2d at 261 n.55 ("[A] court may decline to order an agency to commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content."); Nat'l Sec. Archive Fund, Inc. v. CIA, 402 F. Supp. 2d 211, 220–21 (D.D.C.2005) (finding no reasonably segregable information existed because "the non-exempt information would produce only incomplete, fragmented, unintelligible sentences composed of isolated, meaningless words") (internal quotation and citation omitted).

**IV.    Conclusion**

For these reasons, the Court will grant in part and deny in part Defendant's Motion for

Summary Judgment and will grant in part and deny in part Plaintiff's Cross-Motion for Summary

Judgment.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  July 11, 2019